**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Crim. No. 09-286 (ADM/JJK) |
| Plaintiff, | |
| v. | |
| Nathaniel Jonathan Smith, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Richard A. Newberry, Jr., Esq., Assistant United States Attorney, counsel for Plaintiff.

Andrea K. George, Esq., Assistant Federal Defender, counsel for Defendant.

This matter is before this Court on Defendant Nathaniel Jonathan Smith's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 14), and Pretrial Motion to Suppress Statements, Admissions, and Answers (Doc. No. 15). This Court held a hearing on the motions on December 4, 2009,[1] and received testimony from the following witnesses: Crystal Police Officers Kathleen Gomez and Derrick Hacker. The Court also received four exhibits from the Government. The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn.

---

[1] On December 4, 2009, this Court issued an Order concerning various other motions and took Defendant's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 14), and Pretrial Motion to Suppress Statements, Admissions, and Answers (Doc. No. 15), under advisement on January 12, 2010, for submission to the District Court on a Report and Recommendation. (Doc. No. 28.)

Loc. R. 72.1. For the reasons stated below, this Court recommends that Defendant's motions be denied.

## BACKGROUND

Defendant's motions concern his detention, arrest, and the statements that he made thereafter. Defendant's detention and arrest occurred while the police were providing a police escort for his friend, Hannah Oestreich, for whom he was providing a ride in his vehicle.

At the December 4, 2009 hearing, Officer Gomez provided the following testimony about Defendant's detention and arrest. On December 1, 2008, Ms. Oestreich went to the Crystal Police Department to talk with someone about a Harassment Restraining Order (Hr'g Ex. 2), that had been filed against her by Debbi Kanaka Williams.[2] Officer Gomez met with Ms. Oestreich. Officer Gomez told Ms. Oestreich that she was prohibited from going to the Nevada street address that was indicated on the Harassment Restraining Order. Ms. Oestreich then requested police assistance with recovering her property at that location. Officer Gomez told Ms. Oestreich that the police would provide an escort, but that Officer Gomez would call Ms. Williams first to make sure that she was home.

The next day, during roll call, Officer Gomez learned that another officer had taken a complaint from Ms. Williams that Ms. Oestreich had been calling her, which was a violation of the Harassment Restraining Order. That afternoon, the Police Department received other calls from Ms. Williams stating that

---

[2] Ms. Williams is Ms. Oestreich's child's paternal grandmother.

Ms. Oestreich was calling her again and that Ms. Williams had just seen Ms. Oestreich circling her block (the Nevada Street address) in a green car. Such conduct also violated the Harassment Restraining Order.

That same afternoon, Ms. Oestreich came to the Police Department and requested a police escort to Ms. Williams's address so that she could pick up her property. An officer named Vague met Ms. Oestreich at the Police Department to escort her to Ms. Williams's address. Officer Vague drove her squad car to the address while Ms. Oestreich rode separately in a green car.

Meanwhile, Officer Gomez decided, based on the information from Ms. Williams, that Ms. Oestreich had violated the Harassment Restraining Order and should be arrested. Officer Gomez learned that Ms. Oestreich was at the Nevada Street address and Officer Gomez went there to arrest her, arriving at 2:00 p.m. At that time, Ms. Oestreich was taking her belongings out of a black BMW car and putting them into a small, green car—which was later determined to be Defendant's—where Defendant was sitting in the driver's seat. Officer Gomez approached Ms. Oestreich and advised her that she was under arrest for violating the Harassment Restraining Order. Ms. Oestreich responded to Officer Gomez, stating, "[I]f I tell you about something serious in the car, can I go." (Doc. No. 30, 12/04/09 Hearing Transcript ("Tr.") 14.) Officer Gomez explained to Ms. Oestreich that she was in violation of the Harassment Order and that she could not just let her go. Officer Gomez told Ms. Oestreich that no matter what Ms. Oestreich told her, she was going to be arrested.

3

After running warrant checks on Ms. Oestreich, and after approximately five minutes of being on the scene, Officer Gomez went to talk to Defendant, who was still seated in the driver's seat of his green car, to determine his involvement, if any, with Ms. Oestreich's violation of the Harassment Restraining Order. Officer Gomez asked Defendant for his identity, his cell phone number,[3] and whether he had any knowledge of the Harassment Restraining Order. Defendant was cooperative and provided identification and his cell phone number. Defendant told Officer Gomez that he did not know that there was a restraining order.

Officer Gomez then returned to her squad car to conduct warrant and registration checks on Defendant; the results showed that Defendant had no warrants and that his vehicle registration was in order. At that time, Ms. Oestreich was seated in the back of Officer Gomez's squad car. She iterated that there was something "really serious" in Defendant's car. Officer Gomez testified that Ms. Oestreich "continued to insist that there was something in the car, that there was [sic] drugs and guns in the car." (Tr. 16.) Ms. Oestreich told Officer Gomez that there was a gun "on the back side of the back seat." (Tr. 17.) She also told Officer Gomez that "she believed that

---

[3] Ms. Oestreich had apparently made a phone call using Defendant's cell phone.

4

Defendant had been arrested for drugs," but that "she did not know if he was a felon or not." (Tr. 17-18.)[4]

Officer Gomez then went back to speak to Defendant again. She decided to ask Defendant more questions because, based on Ms. Oestreich's statements and her own experience, she felt at this point that there was a public-safety issue. Officer Gomez asked Defendant what kind of trouble he had been in with police. Officer Gomez testified that Defendant appeared pretty nervous, was squirming around in his seat, and responded that he was on parole for drugs. Officer Gomez then asked him if he had any guns or drugs on him or in his car. Defendant responded that he did not. Officer Gomez asked him why Ms. Oestreich would say that he had those things. Defendant stated that he did not know. Officer Gomez then asked Defendant, "Would you mind if I searched you?" (Tr. 40.) Defendant responded, "Sure." (*Id.*) Defendant then stepped out of the car and Officer Gomez searched him, finding nothing.[5] Officer Gomez asked Defendant for consent to search his vehicle. Defendant told her "no." (Tr. 18.) Officer Gomez asked Defendant if there was a reason why he would not

---

[4] Ms. Oestreich was known to the Crystal Police Department based on a number of calls that had been received in 2007 and 2008 regarding similar harassment issues between her and her family members. Officer Gomez testified, however, that Ms. Oestreich was not known to her as someone who provides information to the police, and that she only assumed her assertions to be true without having further information about her reliability. Officer Gomez also testified that she learned that Ms. Oestreich was a drug user from the Harassment Restraining Order.

[5] Officer Gomez testified that this search occurred approximately ten minutes after she had arrived on the scene.

5

consent to the search; he said no. Officer Gomez testified that Defendant then started to get upset and agitated, in a way that made Officer Gomez believe that he might start fighting with the police officers, and at that point they handcuffed and detained him in her partner's squad car. Officer Gomez testified that, at that point, Defendant was not free to leave.

Because Ms. Oestreich was reporting that there were guns and drugs in the car, and because Officer Gomez knew that both Ms. Oestreich and Defendant (who both had been in the car) were drug users, the officers requested a drug dog to see if the dog would make "a hit" on the car (i.e., indicate that there were drugs in the car). Approximately twenty minutes after Officer Gomez first arrived on the scene, and approximately ten minutes after Officer Gomez had searched Defendant's person, an officer from the Brooklyn Center Police Department arrived with his drug dog. The Brooklyn Center police officer had the dog go around Defendant's vehicle and the officer advised Officer Gomez that the dog did "hit" on the vehicle, signifying the possibility that there were drugs in the car. The Brooklyn Center police officer then began a search of the interior of the car to see if he could find the drugs. At that same time, Officer Gomez returned to her squad car to talk more with Ms. Oestreich, who again insisted that the gun was on the back side of the back seat. Officer Gomez then went back to Defendant's car, went through the passenger compartment of the vehicle, reached behind the back seat, felt a gun through the outside of the carpeting on the back of the back seat, and then retrieved the gun. At that point,

6

the officers advised Defendant that he was under arrest and transported him to the Crystal Police Department. Defendant's car was inventoried and then impounded.

At approximately 4:30 or 5:00 p.m., at the Crystal Police Department, in a room with a table, a couple of chairs, and a door, Officer Hacker interviewed Defendant. Officer Hacker was in plain clothes, but did identify himself as a law enforcement officer. He did not have any weapons with him at the time. Defendant was not handcuffed. Officer Hacker testified that he read Defendant a standard-issue *Miranda* warning from a card. Officer Hacker also testified that during the interview, he did not make any threats or promises to Defendant and that Defendant appeared to understand him and engaged in questions and answers that made sense to Officer Hacker. Officer Hacker said that Defendant was cooperative, did not ask to speak to a lawyer, and did not suggest that he preferred to remain silent. The interview with Officer Hacker was audio recorded.

Defendant was subsequently indicted for being a Felon in Possession of a Firearm in violation of Title 18, United States Code, Sections 922(g)(1), 924(a)(2), and 924(e)(1), and Possession of a Stolen Firearm in violation of Title 18, United States Code, Sections 922(j) and 924(a)(2). (Doc. No. 1.)

## DISCUSSION

### I. Motion to Suppress Evidence

Defendant challenges his detention and arrest in this case on the ground that Officer Gomez did not have reasonable articulable suspicion to detain him.

Based on this challenge, Defendant moves to suppress the physical evidence seized from his vehicle. Specifically, Defendant asserts that the initial reason for Officer Gomez to temporarily detain Defendant was to determine what to do with Ms. Oestreich's property that was in Defendant's car and to investigate whether Defendant knew of the Harassment Restraining Order. Defendant argues that the stop was unjustifiably prolonged because there was no reasonable suspicion to detain Defendant after he provided truthful answers to the initial investigatory questions relating to the Harassment Restraining Order. Defendant further contends that the information provided by Ms. Oestreich lacked veracity and reliability, and therefore, was not enough to form reasonable suspicion for his detention. And Defendant argues that by calling for the drug dog after Defendant had been cooperative and only after he objected to the search of his vehicle, Officer Gomez unreasonably prolonged the detention. More specifically, Defendant asserts that the stop became a *de facto* arrest because he was handcuffed and placed in the back of a squad car without a legitimate purpose for doing so, and because he was detained for an unreasonably long time under the circumstances.

"[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1960). As long as the police have a reasonable, articulable suspicion that criminal activity is afoot, the police may temporarily detain a

8

person.  Such suspicion may not be based on an inchoate or unparticularized suspicion or hunch, but must be grounded on facts which, in light of the officer's experience, support specific, reasonable inferences that justify the intrusion.  *Id.* at 22.  Therefore, when a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative stop of the suspect in order to confirm or dispel his or her suspicions.  *United States v. Johnson*, 64 F.3d 1120, 1124 (8th Cir. 1995) ("The officer may ask the detainee questions in order to dispel or confirm his suspicions, but questioning is limited in scope to the circumstances that justified the stop.").

During the course of a lawful investigatory detention, if the officer reasonably believes that the detained individual might be armed and dangerous, he or she may undertake a patdown search of the individual to discover weapons.  *Terry*, 392 U.S. 25-27.  Additionally, under the federal constitution, an officer conducting a *Terry* stop of an automobile may search the passenger compartment of the automobile for weapons, limited to areas where the weapon might be hidden, if he or she reasonably believes the suspect is potentially dangerous.  *Michigan v. Long*, 463 U.S. 1032, 1049 (1983).

A *Terry* stop may turn into an arrest if the stop lasts for an unreasonably long time or if officers use unreasonable force.  *See Dunaway v. New York*, 442 U.S. 200, 212 (1979).  Thus, the length of the detention must be reasonable. *See United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994) ("We consider both the length of the detention and the efforts of the police to conduct their

investigation quickly and unintrusively in determining whether a detention is reasonable in the context of an investigative stop[.]"). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop[.]" *United States v. Binion*, 570 F.3d 1034, 1040 (8th Cir. 2009) (quotations omitted).

This Court finds that Officer Gomez had a reasonable, articulable suspicion of criminal activity to detain Defendant beyond the initial questioning and that his detention was not unreasonably prolonged. "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990) (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972)). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture' . . . that must be taken into account when evaluating whether there is reasonable suspicion." *Id.* (citation omitted).

The quality of information available to Officer Gomez was sufficient to establish a reasonable suspicion that Defendant possessed drugs and a gun in his vehicle. The fact that Ms. Oestreich was a first-time informant and was under

arrest at the time that she provided Officer Gomez with the tip that there were drugs and a gun in Defendant's vehicle does not mean that her tip lacked reliability. *See, e.g., Adams*, 407 U.S. at 146-48 (holding that the police, acting on an informant's tip, may reach into the passenger compartment of an automobile to remove a gun from a driver's waistband even where the gun was not apparent to police from outside the car and the police knew of its existence only because of the tip); see also United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2000) (stating that "the informant was reporting what he had observed moments ago," satisfying basis of knowledge, and informant contacted officer face-to-face, which is more reliable than an anonymous phone call because "the officer has an opportunity to assess the informant's credibility and demeanor," and when information is about "someone nearby . . . the informant is exposed to a risk of retaliation from the person named, making it less likely that the informant will lie."); *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false.") (quotations omitted); *United States v. Delario*, 912 F.2d 766, 768 (5th Cir. 1990) (concluding there was reasonable suspicion even though the informant was a first time informant of unproven reliability, because the informant "predicted in great detail the events which would transpire, and each was corroborated by police observation").

Here, Ms. Oestreich reported to Officer Gomez face-to-face that there were drugs and a gun in Defendant's car, provided the specific location of the gun in the car, and stated that she believed that Defendant had been arrested for drugs before. During this face-to-face contact, Officer Gomez had an opportunity to assess Ms. Oestreich's credibility and determine that her statements had some reliability based on what Officer Gomez already knew—that Ms. Oestreich had been in Defendant's car only minutes before, and that Ms. Oestreich was a drug user. In addition, Officer Gomez was able to make a judgment on whether Ms. Oestreich's report might have truth to it based on Ms. Oestreich's body language and insistence, and based on Officer Gomez's own experience dealing with reports of criminal activity. Under these circumstances, both the quality and quantity of information available to Officer Gomez was sufficient to establish a reasonable, articulable suspicion that criminal activity was afoot, which then justified her returning to Defendant's car to question Defendant a second time. At that point, her suspicions were further heightened when Defendant admitted that he was on parole for drugs. Based on these suspicions, which this Court finds are reasonable, Officer Gomez was justified in further detaining Defendant for the purpose of making a pat-down search. Although nothing was discovered during the pat-down of Defendant, Officer Gomez had not yet had the opportunity to search the vehicle to dispel her initial reasonable concerns of a safety threat. Therefore, she was justified in detaining Defendant further for the purpose of making a protective sweep of Defendant's vehicle.

In *Michigan v. Long*, 463 U.S. 1032 (1983), the Supreme Court stated that:

> [P]rotection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

463 U.S. at 1049 (quoting *Terry*, 392 U.S. at 21). Here, the fact that at this point there was not yet probable cause for Defendant's arrest does not negate Officer Gomez's legitimate concern for the officers and others' safety. *See id.* ("If a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested."). As recognized in *Long,* "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Id.* at 1052 (citing *United States v. Powless*, 546 F.2d 792, 795-96 (8th Cir. 1977)). "[T]he officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger . . . .'" *Id.* (quoting *Terry*, 392 U.S. at 28.) Officer Gomez possessed an articulable and objectively reasonable belief that Defendant was potentially dangerous, and she and the other police officers did not act unreasonably in taking preventative measures to ensure that there were no weapons within

13

Defendant's immediate grasp before permitting him to reenter his vehicle. Therefore, just as the police, acting on an informant's tip, were allowed to reach into the passenger compartment of an automobile to remove a gun from a driver's waistband when the gun was not apparent to police from outside the car and the police knew of its existence only because of the tip, *Adams*, 407 U.S. at 146-48, here, the police, acting on the tip from Ms. Oestreich, were allowed to reach into the passenger compartment of Defendant's vehicle and feel for and retrieve the gun located behind the backseat.

Further, the limits of the *Terry* stop were not exceeded when Defendant was handcuffed and placed in a squad car while the officers waited for a drug dog and searched the vehicle. "Several . . . circuits . . . have found that using handcuffs can be a reasonable precaution during a *Terry* stop." *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (citing cases); *see also State of Minn. v. Munson*, 594 N.W.2d 128, 137 (Minn. 1999) ("We have also held that briefly handcuffing a suspect while the police sort out the scene of an investigation does not per se transform an investigatory detention into an arrest, nor does placing the suspect in the back of a squad car while the investigation proceeds."). The court in *Navarrete-Barron* explained:

> In light of the dangerous nature of the suspected crime of drug trafficking and the good possibility that the driver or passenger had a weapon, the defendant's confinement with handcuffs in the back of a police car during the search of the truck was reasonably necessary to maintain the status quo, protect the officers, and allow them to conduct the search of the truck immediately and without interference.

192 F.3d at 791. Similarly here, Officer Gomez suspected some sort of drug offense and the good possibility that Defendant had a weapon within close proximity. In addition, the record reflects that Defendant had started to get upset with Officer Gomez after she questioned him about searching his vehicle. Therefore, Defendant's confinement in handcuffs in the back of a squad car during the search of his vehicle was also reasonably necessary to maintain the status quo, protect the officers and others, and to allow them to conduct a protective sweep without interference.

In addition, Defendant's detention did not last for an unreasonably long time before probable cause was established to arrest him. The search of Defendant's vehicle occurred within approximately ten minutes of when Defendant was detained in the police car, and approximately twenty minutes after Officer Gomez first started questioning Defendant. Thus, because Officer Gomez did not use unreasonable force and did not hold Defendant for an unreasonably long detention during the *Terry* stop, this Court concludes that the stop did not turn into a *de facto* arrest without probable cause. *See United States v. Lego*, 855 F.2d 542, 545 (8th Cir. 1988) (concluding no *de facto* arrest when suspect was placed in a police vehicle during an investigatory stop for a brief period of time); *United States v. Manbeck*, 744 F.2d 360, 377-78 (4th Cir. 1984) (concluding no *de facto* arrest when suspect was placed in a police vehicle during for fifteen minutes before probable cause was apparent); *see also United*

States v. Thompson, 906 F.2d 1292, 1296-97 (8th Cir. 1990) (concluding that detaining the defendant in a locked police car when there were approximately seven squad cars on scene, neither suspect had made any furtive movement, and where the entire encounter lasted ninety minutes constituted an arrest).

Finally, Defendant argues that the evidence seized from Defendant's vehicle should be suppressed because the Government has not shown the reliability of the drug dog and its handler. As explained above, Officer Gomez had reasonable, articulable suspicion that drugs and a gun were in Defendant's car. "It is well established that once reasonable suspicion is established, a search of a vehicle's interior is permissible[.]" *Navarrete-Barron*, 192 F.3d at 791. A protective sweep of the car was justified even without the hit from the drug dog. Thus, even though the Government did not make any showing about the ability of this particular dog to detect drugs, the lack of such a showing is of no consequence in this case. The fact that the drug dog alerted positively merely added confirmation to Officer Gomez's reasonable suspicion, which was already well grounded in the information provided from Ms. Oestreich and Defendant's statements and behavior, that the sweep for the gun should be conducted.

For the reasons provided above, the evidence seized pursuant to the search of Defendant's vehicle was not unlawfully obtained in violation of Defendant's constitutional rights. Therefore, this Court recommends that Defendant's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 14), be denied.

## II. Motion to Suppress Statements

Defendant contends that any statements he made following his arrest should be suppressed because they are fruits of the unlawful seizure. Because this Court concludes that the seizure was not unlawful, Defendant's motion to suppress statements should be denied.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 14), be **DENIED**; and

2. Defendant's Pretrial Motion to Suppress Statements, Admissions, and Answers (Doc. No. 15), be **DENIED**.

Date: January 14, 2010

                              *s/Jeffrey J. Keyes*
                              JEFFREY J. KEYES
                              United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 26, 2010**,[6] a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **seven days** after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This

---

[6] Because of the extensions previously granted in this case and the currently scheduled trial date, this Court has decreased the amount of time the parties have to object to this Report and Recommendation and to respond to any objections.

Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.